Count  IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MICHAEL CHATMAN,               )
                               )
            Plaintiff,         )
                               )
      v.                       )
                               )        1:24-cv-1585 (LMB/WEF)
PETE HEGSETH, Secretary of the U.S.  )
Department of Defense, et al.,  )
                               )
            Defendants.        )

## MEMORANDUM OPINION

Before the Court are the parties' cross-motions for summary judgment in a civil action

brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.,

for age discrimination and hostile work environment based on age, as well as multiple claims of

retaliation under the ADEA and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e et seq., by pro se plaintiff Michael Chatman ("plaintiff" or "Chatman") against

the Secretary of the U.S. Department of Defense, the Secretary of the Army, and the Director of

the Defense Contract Management Agency ("defendants").  The motions have been fully briefed

and the Court has determined that oral argument will not further the decisional process.  For the

reasons discussed below, plaintiff's motion for summary judgment will be denied [1] and

defendants' motion for summary judgment will be granted.

---

[1] Plaintiff also moves for default judgment.  Under Fed. R. Civ. P. 55(c), default is appropriate
where "a party against whom a judgment for affirmative relief is sought has failed to plead or
otherwise defend."  Because defendants have timely responded to each of plaintiff's complaints,
default judgment is inappropriate and plaintiff's request for such relief will be denied.

## I. BACKGROUND

### A. Procedural Background

Chatman, a former employee of the Defense Contract Management Agency ("DCMA") filed this civil action on February 14, 2023, in the U.S. District Court for the Northern District of Georgia, alleging violations of Title VII and the ADEA in connection with his deployment to Afghanistan as a civilian contract specialist. On September 14, 2023, defendants filed a Motion to Dismiss for Failure to State a Claim or, in the Alternative, Motion for More Definite Statement, which the Georgia court denied as moot because Chatman filed an Amended Complaint on September 26, 2023. Thereafter, defendants filed a Motion for More Definite Statement or, in the Alternative, Motion to Dismiss for Failure to State a Claim. The Georgia court granted the Motion for More Definite Statement and ordered Chatman to file a second amended complaint. Chatman filed a Second Amended Complaint on March 7, 2024, to which defendants filed a Second Motion for More Definite Statement. Chatman filed a Third Amended Complaint on June 3, 2024. Defendants filed a Motion to Dismiss or, in the Alternative, to Transfer. On September 9, 2024, the Georgia court denied defendants' Motion to Dismiss but granted defendants' Motion to Transfer and ordered that this civil action be transferred to this district. On September 12, 2024, this Court issued a Scheduling Order, which stated that discovery was to be completed by February 7, 2025. During the discovery period, defendants filed a Motion for Judgment on the Pleadings. The Court issued a Roseboro notice to Chatman, advising him of his right file an opposition, which he did. At the final pretrial conference on February 13, 2025, which plaintiff did not attend,[2] the Court orally granted a portion of

---

[2] Plaintiff requested to attend the final pretrial conference remotely due to severe weather in Georgia. The Court denied his request because it does not conduct remote proceedings;

defendants' Motion for Judgment on the Pleadings as to plaintiff's claims under Title VII based on national origin, race, and sex,[3] and denied the motion as to plaintiff's claims under the ADEA for age discrimination, hostile work environment based on age, and retaliation for filing an Equal Employment Opportunity Commission ("EEO") complaint. [Dkt. No. 74]. As a result, only the following counts remain: Count 2 (age discrimination), Count 5 (retaliation), Count 6 (retaliation), Count 7 (retaliation), Count 8 (retaliation), and Count 10 (hostile work environment based on age).

B. Statement of Undisputed Material Facts

To facilitate the adjudication of motions for summary judgment, Local Civil Rule 56 contains a provision requiring the moving party to set forth "a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue," as well as citations to the record to support such facts. E.D. Va. Loc. Civ. R. 56(B). The local rule further provides that the nonmovant's brief should include a similar "specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue," as well as citations to the record. Id. The local rule expressly permits the Court to assume the truth

---

however, the Court provided plaintiff with a transcript of the proceedings to ensure that he was aware of what happened at the conference. [Dkt. No. 74].

[3] The Court's ruling will result in the dismissal of the following counts: Count 1, alleging that plaintiff's deployment was terminated early based on his race, sex, and national origin; Count 3 alleging a hostile work environment based on plaintiff's race; Count 4, alleging that plaintiff was wrongfully placed on a performance plan based on his race and sex; and Count 9, alleging that plaintiff received less favorable job assignments and negative disciplinary actions and performance evaluations based on his race, sex, and national origin. Despite the Court's finding that these counts do no state plausible claims, plaintiff's summary judgment motion and his opposition to defendants' summary judgment motion repeatedly address his race discrimination allegations. Because race discrimination is no longer at issue in this civil action, the Court will neither consider nor address plaintiff's race-based arguments here.

of any facts identified by the moving party as undisputed that are not expressly controverted by the opposing party. Id.

Defendants' brief complies with Local Civil Rule 56 by including a section entitled "Statement of Undisputed Material Facts," which cites to the evidentiary record, including depositions, declarations, and business records, to support those facts. Plaintiff's opposition does not comply with Local Civil Rule 56 as it neither contains a separately captioned fact section that identifies material disputed facts nor cites to verified evidence to dispute defendants' statement of material facts; instead, plaintiff's opposition relies solely upon repeating allegations from the Third Amended Complaint and referring to several unverified documents that are not a part of the record. For example, plaintiff refers to, without attaching, a September 16, 2020 "Affidavit for [sic] Ms. Litchelle Brown,"[4] [Dkt. No. 95] at 6 and 8; a "November 2018[] statement of Ms. Brown," id. at 11; and two complaints of race-based discrimination claims brought by Brown and another African American who worked in the same section as plaintiff, id. at 3-4. Because "allegations in an unsworn complaint are not summary judgment evidence," Sanchez v. Sanchez, 2015 WL 5016842, at *1 (N.D. Fla. Aug. 24, 2015), and plaintiff has not disputed any material facts with verified record evidence, defendants' statement of undisputed material facts will be deemed admitted and will govern the factual record for purposes of resolving their motions for summary judgment. Katz v. Garland, No. 1:20-cv-554, 2023 WL 11990807, at *2 (E.D. Va. Mar. 16, 2023) ("[W]here facts were denied but not supported with record evidence, the defendant's asserted undisputed fact is deemed admitted.").

---

[4] Litchelle Brown is an African American contractor who worked in the same procurement section as plaintiff.

Similarly, plaintiff's motion for summary judgment fails to comply with Local Civil Rule 56. Although the motion contains a section titled "Statement of Undisputed Material Facts," it contains no facts; rather, it purports to list the elements for employment discrimination and hostile work environment claims and cites to two unrelated EEOC decisions and several cases from other jurisdictions. [Dkt. No. 91] at 7-9. Plaintiff's motion also refers to the 2020 Brown Affidavit, the 2018 Brown Statement, and a statement by "Mr. Shaikh Sohail Ahmad," none of which are attached to plaintiff's motion and which he did not produce during discovery. Defendants attach to their opposition what appear to be the 2018 Brown and Shaikh statements, but neither are verified nor related to plaintiff's claims of age discrimination, hostile work environment based on age, or retaliation.[5] [Dkt. No. 94-1] at 6-9. "It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment." Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993). Accordingly, plaintiff has not produced any evidence in support of his claims.

The following facts are derived from the defendants' statement of undisputed material facts and the record evidence. Chatman, who was born in 1956, was employed by DCMA from 1991 until 2020, when he retired at age 64. DCMA is a component of the U.S. Department of Defense that provides contract administration services. In 2017, Chatman was accepted into the Ministry of Defense Advisors Program, which paired senior Defense Department civilian experts with foreign counterparts in Afghanistan to train, advise, and assist foreign counterparts in

---

[5] Shaikh's statement recounts an altercation between Shaikh and J.R. Nolen (plaintiff's supervisor) during which Nolen became hostile and aggressive. There is no mention or inference of discrimination. Brown's statement describes the altercation between Shaikh and Nolen and how she felt unsafe because Nolen was armed and shouting profanities. Brown's statement also describes a conversation she had with Holdcraft about him requiring contractors to sign in and out for the day.

developing their own processes. Deployments to Afghanistan were for one year and could be extended based on mission need, employee performance, and approval by the individual's home office. In 2018 and 2019, the number of Defense Department employees in Afghanistan was being reduced at the president's direction, making deployment extensions less likely. [Dkt. No. 88-1] at 173. At that time, approximately only five percent of advisors' requests for extensions were granted. Id. at 172.

Chatman was deployed to Afghanistan as a procurement advisor for the Combined Security Transition Command – Afghanistan ("CSTC-A") from April 2018 through February 2019.[6] Specific advisor assignments and duty stations were made upon arrival in Afghanistan and could be changed based on mission needs. Beginning in or about May 2018, Chatman was assigned to the Procurement Cell in the Resource Management-Defense Procurement ("RM-DP") Directorate at HQ Resolute Support ("HQ"), which consisted of approximately a dozen procurement advisors who were government employees, government contractors, or procurement specialists from other countries. Id. at 166-67. When Chatman arrived at HQ, Jean-Anne Butler was the Procurement Cell Chief and Chatman's first-line supervisor. Butler assigned Chatman to the post-award contracting team, along with Paula Webb and Kenneth Holdcraft. See id. Kenneth Holdcraft, who was born in 1958, was two years older than Chatman. He was not Chatman's supervisor but was designated the "team lead" by Butler. Id. at 167. Before Butler's tour of duty ended in mid-July 2018, she met with Holdcraft and J.R. Nolen to discuss Chatman's performance issues. Nolen, who was born in 1955, and was only one year younger than Chatman, became Chatman's first-line supervisor after Butler left. Butler had observed that

---

[6] Chatman's deployment was scheduled to end on March 31, 2019, but he returned to the United States in February 2019.

Chatman had not been engaging with or training his Afghan counterparts as required, had fallen asleep during meetings, and had not improved his performance despite receiving constructive feedback from Butler on multiple occasions. Id. at 168.

In June 2018, at the direction of Abbas Mizra,[7] Holdcraft gave Chatman a month-long "Employee Performance Plan" that set forth various performance objectives related to post-award contracting. Both Chatman and Holdcraft signed the document. Id. at 197. At the end of the one-month period, Holdcraft drafted a two-page assessment of Chatman's performance, concluding that "Michael is not a good fit for this office. . . ." Id. at 198. Holdcraft moved the written assessment from his desktop to an internal shared network drive during an IT maintenance period, intending to keep it there only temporarily as a backup, but forgot to remove it after the maintenance had been completed. Id. at 191, 202. When Chatman discovered the document on the shared drive, he notified Holdcraft, who then removed it, but not before some of Chatman's colleagues had already seen it. Chatman also notified Robert Warner, who was born in 1966 and was plaintiff's second-line supervisor, id. at 220, about the improper storage of the document on the shared drive, see id. at 202. Warner met with Chatman to discuss the incident that same day, on October 20, 2018. Id. Warner also met with Holdcraft and Nolen separately and stressed the importance of "making sure the files in question were properly stored and protected." Id. Despite Holdcraft's negative written assessment, Chatman's home office supervisor rated him "outstanding" on all performance elements for the appraisal period April 1, 2018 through March 31, 2019. Id. at 210-16.

In August 2018, Kevin Kelly and Colonel John (Jay) Cooper, the Branch Head and Deputy Branch Head for Resource Management, CSTC-A, decided to move post-award

---

[7] Mizra was Chatman's second-line supervisor at the time. [Dkt. No. 88-1] at 166, 219.

contracting duties out of the Procurement Cell and assign them to another unit that worked directly with the Afghan National Procurement Commission, which would be responsible for reviewing the "complete procurement action from cradle to grave." Id. at 158, 160, 181, 185. Holdcraft notified Chatman of this change, which affected the entire Procurement Cell. As a result of this change, Chatman was assigned to advise two Afghan budget units on procurement issues. Id. at 185. Chatman was also assigned collateral duties, including delivering phone cards and mail, which comprised approximately 10 percent of his work. Id. at 241, 243. It was around this time that Chatman submitted a request to Nolen to extend his deployment. Id. at 35. Nolen did not have authority to grant the extension as only the Command Group in the CSTC-A had such authority. Id. at 162, 189. In August 2018, Chatman was notified that his extension was not granted. Id. at 35.

On November 12, 2018, Warner assigned Chatman to work on projects with the Construction and Property Management Department ("CPMD") and the Joint Engineers ("GS-ENG"), which accounted for nearly half of all projects on that fiscal year's procurement plan. Id. at 204. CPMD was the procurement section's largest "customer." Warner informed Chatman that this was an important assignment that would best utilize his experience and skills:

> If you look at the procurement tracker, you can see that CPMD and GS-ENG are very slow in getting through all phases of the procurement process. They need to get contracts awarded much faster. I need you to use your extensive experience to TAA these guys and show them how to get things done. This is a big assignment that gives you a lot of autonomy. I think it will give you the chance to really maximize all you bring to the table. I don't think you have been given sufficient opportunity to do that until now. Pekita will also be working CPMD and GC-ENG. Two heads are better than one. You will make a strong team.

Id. The assignment required Chatman to relocate to the New Kabul Compound ("NKC") so that he would be in walking distance to his Afghan counterparts. Id. at 207. Relocation to the NKC

was necessary because travel between HQ and the NKC was difficult, requiring helicopter transport, which was often cancelled or delayed due to weather or security concerns. Id.

On November 13, 2018, the day after this new assignment, Chatman contacted an EEO counselor, claiming that he was being discriminated against based on his race, color, sex, and age. Id. at 22-29. Chatman received a notice of right to file a formal EEO complaint on or about December 13, 2018. See id. at 223.

In the first or second week of December 2018, plaintiff overheard Nolen and Holdcraft, both of whom were in their 60s, say that Chatman was "too old to be on deployment" and that he was "[un]able to do the job because, based on his age." Id. at 79-80. Also in early December 2018, before plaintiff moved to the NKC, he returned from vacation and found that Holdcraft had moved his desk into the hallway. The record evidence shows that Holdcraft moved Chatman's desk to make space for incoming NATO officials. Id. at 236.

In February 2019, approximately two months into his assignment at the NKC, Chatman was directed to return to HQ. Because Chatman did not want to move again with less than a month left of his deployment, he decided to return to the United States. As a result, he was directed to depart Afghanistan by a certain date. Id. at 86. Chatman complains that he had to take four different flights to return to the United States: (1) a helicopter from the NKC to Bagram, (2) a cargo plane from Bagram to Kuwait, (3) a plane from Kuwait to Germany, and (4) a commercial flight from Germany to Baltimore. Id. at 87-88. Chatman did not need a reservation to fly by helicopter from the NKC to Bargram—he simply presented his military identification card and boarded a helicopter, id. at 94-95; however, once he arrived at Bagram, he discovered that HQ had not made his other travel arrangements. Plaintiff first contacted a former

office mate at the NKC to ask him for assistance with travel arrangements. <u>Id.</u> at 98. Chatman

ultimately contacted his supervisor at HQ directly—

> I finally sent my supervisor an email and asked him "What's the status?" I'm like,
> "I'm in Bagram like you told me to leave, and I have no reservation to leave the
> country." And I was in Bagram for a whole week. And the next day I get an email
> from my supervisor saying, "Why did you contact the people in NKC trying to
> make an arrangement to come back to the NKC? We told you to leave the country.
> Are you trying to make it back to the NKC?" I'm like, "No, I'm in Bagram…. [Y]ou
> all did not make any reservation for me." "We did." I'm like, "I don't have it."
> That's when they got in contact with the transportation office in RS and they made
> the rest of the flight reservation for me to leave the country.

Id. at 98-99. Because Chatman's travel arrangements had not been made before he left

for Bagram, there was no available lodging at Bagram and Chatman had to sleep in the

base's movie theater for four nights. <u>Id.</u> at 99. After Chatman notified personnel at HQ

that he was there, his travel arrangements to the United States were made. <u>Id.</u> at 89, 99.

## II. ANALYSIS

### A. <u>Legal Standard</u>

Summary judgment is appropriate when the record shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The moving party bears the initial burden of "pointing out to the district court [ ]

that there is an absence of evidence supporting the nonmoving party's case," after which the

nonmoving party must "go beyond the pleadings" and present specific facts to establish a

genuine issue for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324–25 (1986). In going beyond

the pleadings, "the non-moving party may not rely upon mere allegations" and "his response

must, with affidavits or other verified evidence, set forth specific facts showing that there is a

genuine issue for trial." <u>Graham v. Geneva Enters.</u>, 55 F. App'x 135, 136 (4th Cir. 2003) (per

curiam). If the nonmoving party fails to provide evidence that establishes an essential element of

his case, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." Casey v. Geek Squad, 823 F. Supp. 2d 334, 352 (D. Md. 2011) (quoting Celotex, 477 U.S. at 322-23, (1986); Coleman v. United States, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)).  When there are cross-motions for summary judgment, a court "consider[s] and rule[s] upon each party's motion separately and determine[s] whether summary judgment is appropriate as to each." Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999).

Although the court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks omitted).

Defendants have moved for summary judgment on all counts, arguing that (1) plaintiff has no direct or circumstantial evidence of aged-based animus, (2) defendants had legitimate, non-discriminatory reasons for taking the alleged adverse actions, (3) there is no causal link between plaintiff's protected activity and the alleged adverse actions, and (4) defendants' alleged conduct was not sufficiently severe or pervasive to establish a hostile work environment claim. Chatman has also moved for summary judgment, asserting that he has provided sufficient evidence to meet his burden of proof on all counts.

B. Age Discrimination

The ADEA contains a federal-sector provision, 29 U.S.C. § 633a, which prohibits the

federal government from discriminating based on age in any "personnel actions." See 29 U.S.C.

§ 633a(a).  Historically, the courts have interpreted the ADEA's federal-sector provisions in pari

materia with its private-sector provisions prohibiting adverse "employment actions." See, e.g.,

Peary v. Goss, 365 F. Supp. 2d 713, 722 (E.D. Va. 2005).  As defendants correctly recognize, the

U.S. Supreme Court has signaled that the federal-sector term "personnel action" should be

interpreted more broadly than its private-sector counterpart "employment action."  In Babb v.

Wilkie, a case involving the federal-sector version of the ADEA, the Court observed in dicta

that, although "personnel action" was not defined in the ADEA, its "meaning is easy to

understand" by reference to the Civil Service Reform Act of 1978 ("CSRA").  589 U.S. 399

(2020).  The CSRA provides a list of "personnel actions," including among others, appointment,

promotion, transfer, reassignment, and performance evaluations, regardless of the impact they

have on the employee's job responsibilities.  5 U.S.C. § 2302(a)(2).  The CSRA also has a catch-

all provision for "any other significant change in duties, responsibilities, or working conditions."

Id.[8]

---

[8] By contrast, to prevail on a private-sector ADEA discrimination claim, the employment action "must adversely affect 'the terms, conditions, or benefits' of the plaintiff's employment." Fellores v. Winter, No. 2:06-cv-551, 2007 WL 2471527 at *3, (E.D. Va. Aug. 23, 2007) (quoting Richardson v. Richland Cnty. Sch. Dist. No. One, 52 Fed. App'x 615, slip op. at 1 (4th Cir. 2002)).  The Supreme Court recently clarified this standard in Muldrow v. City of St. Louis, 601 U.S. 346, 355 (2024), where it found that, contrary to Fourth Circuit precedent, an employee need not demonstrate that the asserted adverse employment action was "significant;" rather, the employee need only show that he suffered "some harm" to a term or condition of employment— that is, the employer treated him "worse" because of a protected characteristic.  Id. abrogating James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376 (4th Cir. 2004) (adverse employment action must have "significant detrimental effect"); see Grant v. N.C. Dep't of Transp., No. 23-CV-702, 2024 WL 2789388, at *3 (E.D.N.C. May 30, 2024) (applying Muldrow to an ADEA

To succeed on a claim for disparate treatment age discrimination under the ADEA, a plaintiff must prove that (i) he was a member of the protected class, i.e., age 40 or older; (ii) he suffered an adverse employment action; (iii) he was meeting his employer's expectations at the time of the adverse employment action; and (iv) he was treated less favorably than someone outside the protected class. Rivera v. United States Dep't of Defense, No. 3:24-cv-646, 2024 WL 4894848, at *5 (E.D. Va. Nov. 26, 2024) (citing Sullivan v. Perdue Farms, Inc., 133 F. Supp. 3d 828, 837 (E.D. Va. 2015)); see Wilson v. City of Chesapeake, 290 F. Supp. 3d 444, 456 (E.D. Va. 2018). A plaintiff bringing a discrimination claim under the ADEA must prove that age was not merely a motivating factor of the challenged adverse employment action but was in fact its "but-for" cause. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009).

A plaintiff may prove an ADEA discrimination claim using either direct evidence of age discrimination or circumstantial evidence. See Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009). When analyzing an ADEA discrimination claim based on circumstantial evidence, courts use the three-stage, burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, (1973). Westmoreland v. TWC Admin. LLC, 924 F.3d 718, 725 (4th Cir. 2019). At the first stage, the employee must establish the four elements to make out a prima facie case of age discrimination. Id. If the employee does so, the burden shifts to the employer to rebut the presumption of discrimination by producing evidence that it acted for a legitimate, nondiscriminatory reason. Id. This burden is one of production, not persuasion, as it involves no credibility assessment. Id. At the final stage, "the employee must 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant[-employer]

---

claim). Consequently, if a "personnel action" is treated more broadly than an "employment action," then the "significant" threshold that that the Supreme Court rejected for employment actions would still apply to personnel actions under the CSRA's catch-all provision.

were not its true reasons, but were a pretext for discrimination.'" Id. (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).  And under either method of proof—by direct or circumstantial evidence—it remains the plaintiff's ultimate burden to prove that his age was the "but-for" cause of the adverse employment action.  Gross v. FBL Financial Svcs., Inc., 557 U.S. 167, 176 (2009).

Count 2 alleges that defendants discriminated against Chatman based on his age when they removed his post-award contracting duties, gave him collateral duties, and ended his deployment prematurely.  To prove this age discrimination claim, plaintiff relies on statements he overheard in early December 2018, when Nolen and Holdcraft said that plaintiff was "too old to be on deployment" and that he was "[un]able to do the job because, based on his age."  [Dkt. No. 88-1] at 79-80.  "Derogatory comments about an employee's age may be direct evidence of age discrimination, provided they concern the employee's age and sufficiently demonstrate that the employer's age-related animus affected the employment decision at issue."  Arthur v. Pet Dairy, 593 Fed. App'x 211, 218 (4th Cir. 2015).  To constitute direct evidence of discrimination, the comments must be "1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the complained-of adverse employment decision; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue."  Id. at 219.

Defendants do not dispute that plaintiff is a member of the protected class or that the removal of post-award contracting duties was an adverse employment action; however, they argue that plaintiff's age discrimination claim fails because plaintiff cannot show that age-related animus was the but-for cause of the adverse employment actions at issue.  Here, the undisputed evidence shows that neither Nolen nor Holdcraft made the decision to remove post-award

contracting duties from Chatman; rather, it was Kelly and Cooper who made the decision to remove such duties from the entire unit in which Chatman worked.  Accordingly, Nolen's and Holdcraft's comments about Chatman's age can only be considered evidence of discriminatory intent if they had "singular influence" over Kelly and Cooper and "use[d] that influence to cause the adverse employment action." Staub v. Proctor Hosp., 560 F.3d 647, 651 (7th Cir. 2009); see also Lucas v. Chicago Transit Auth., 367 F.3d 714, 730 (7th Cir. 2004) ("Generally speaking, comments by a non-decision maker do not suffice as evidence of discriminatory intent.").  There is no evidence in the record that either Nolen or Holdcraft had singular influence over Kelly and Cooper or that they used such influence to cause the change in duties.[9]

Furthermore, plaintiff has not shown that he was treated less favorably than someone outside the protected class.  Kelly and Cooper's decision to move post-award contracting duties to another unit affected all employees in the Procurement Cell, not just plaintiff.  Plaintiff acknowledged this during his deposition:

> Q:  We talked a little bit earlier about your belief in August of 2018, Holdcraft and Nolen removed you from post award duties.  How did he tell you this? ***
>
> A:  I was told by Ken [Holdcraft], . . . "Hey, Mike, we're no longer doing post award." Okay.  And that "We are no longer doing post award" and they wanted to give it to another section; okay? And I said, "Okay, great."  So that's when they came up with these other duties, as assigned, like that documentation that you submitted earlier; okay?  And wanted me to do the service.  And I said, "Well, no.  Give me something that was related to contracting, at least; okay?"  And later on, I was told by Mr. Nolen that if I didn't accept these new duties, to pack my bag, jump on the plane, and go back to the States."
>
> Q:  Okay. So he said to you, "We are no longer doing post award."  What did he mean by "we're"?
>
> A:  Us.

---

[9] There is also a temporal disconnect.  According to Count 2's allegation, the decision to change the duties of Chatman's group was made in August 2018.  The two statements about his age were made in December 2018, months after the change of duties decision.

Q: Us?

A: Because he was part of the team.

Q: Okay. So it wasn't just –

A: He was part of the team.

Q: So it wasn't just you that lost post award contracting duties?

A: He meant the contracting section; okay?

Id. at 60-61. This evidence clearly shows that the change in plaintiff's underlying duties was not based on age-related animus aimed at plaintiff but was a decision by senior leadership to restructure the procurement program.

Moreover, everyone who worked in the Procurement Cell had collateral duties unrelated to their contracting work, which ranged from making copies, to delivering mail, to cleaning bathrooms. Id. at 186 (listing each member of the Procurement Cell and their collateral duties). Everyone was expected to contribute to office operations as "[a]dministrative duties . . . also [had to] be accomplished in addition to the advisory mission." Id. at 170, 186. Lastly, even with the restructure, Chatman still had contracting responsibilities as he was assigned to work with two Afghan budget units to advise them on procurement issues. Id. at 185.

The only other place in the Third Amended Complaint that alleges an age-related adverse employment action is page two, which states: "In February 2019, Plaintiff's one year deployment was early ended by Defendants (Col. Cooper and Holdcraft), while working for the DOA, under the guise of his [sic] not understanding post award contracting and not being able to draft reports or contract procedures and these managers saying at his age he was too old to be deployed for 12 months." [Dkt. No. 29] at 2. Defendants correctly point out that contrary to that allegation,

16

plaintiff admitted during his deposition that he chose to end his deployment three weeks early rather than return to HQ. [Dkt. No. 88-1] at 86.

Because the undisputed facts show that age-related animus toward Chatman was not the but-for cause of the removal of his post-award contracting duties, the assignment of collateral duties, and the early termination of his deployment, Chatman's age discrimination claim fails.

C. Retaliation

The ADEA's federal-sector provision prohibits retaliation against an employee who complains of age discrimination. See 29 U.S.C. § 633a(a); Gomez-Perez v. Potter, 553 U.S. 474, 477 (2008) (holding that a federal employee can bring a claim for retaliation under the ADEA). A plaintiff may prove an ADEA retaliation claim either through direct evidence of retaliatory animus or via the application of the McDonnell Douglas burden-shifting framework. Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 122 (4th Cir. 2021). Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of retaliation by showing (1) that he engaged in a protected activity; (2) that his employer took a materially adverse action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action. See King v. Rumsfeld, 328 F.3d 145, 150-51 (4th Cir. 2003). A "materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 68; see also Harman v. Unisys Corp., 356 Fed. Appx. 638, 641 (4th Cir. 2009). Because employees are protected "not from all retaliation, but from retaliation that produces an injury or harm," materially adverse actions do not include "trivial" harms. See Burlington, 548 U.S. at 67–69. If a plaintiff establishes a prima facie case, the burden shifts to the employer to show that it took the alleged adverse action "for a legitimate non-retaliatory reason." Roberts, 998 F.3d at 122. If the employer makes that

17

showing, then the burden shifts back to the plaintiff "to rebut the employer's evidence by demonstrating the employer's purported non-retaliatory reasons were pretext for discrimination." Id.

In Counts 5 and 6, plaintiff claims that he was retaliated against for his EEO activity when defendants "mov[ed] him to an unsafe working location (NKC)," and when Holdcraft "placed negative remarks [about him] in the Share [sic] Drive for all to see," respectively. Defendants argue that Count 5 fails regardless of whether plaintiff's transfer to the NKC was an adverse employment action, because the transfer decision was made before plaintiff engaged in the protected activity, which defeats any claim of a causal connection. The record evidence shows that Warner sent an email to Chatman on November 12, 2018, informing him that he was being reassigned to the NKC to work on the CPMD and GS-ENG projects. [Dkt. No. 88-1] at 204. It was not until the next day, on November 13, 2018, that Chatman contacted an EEO counselor to raise his discrimination claims. Id. at 222-23. Because there is no causal connection between Chatman's protected EEO activity and his reassignment to the NKC, Count 5 fails. Similarly, Count 6 fails because the adverse action, Holdcraft's placing a critical assessment of Chatman's work performance on the shared drive, occurred no later than October 30, 2018, nearly two weeks before Chatman met with the EEO counselor on November 13, 2018.

Although Counts 7 and 8 allege adverse actions that occurred after plaintiff's protected activity, they both fail because they are not supported by any evidence in this record. Count 7 alleges that when Chatman declined to return from the NKC to HQ in February 2019, defendants retaliated against him by not making his travel arrangements to the United States before he left the NKC for Bagram. The delay in arranging for Chatman's return caused him to spend four nights in Bagram, where he had to sleep in the military base's movie theater due to not having

18

lodging reservations at the base. Although this situation may have been inconvenient and uncomfortable, defendants' failure to make travel arrangements for one segment of a lengthy trip would not dissuade a reasonable worker from making or supporting a charge of discrimination. Because such action does not rise to the level of a materially adverse action, Count 7's retaliation fails.

Moreover, even if the failure to make timely travel arrangements were considered a materially adverse action, there is no evidence in the record showing a causal connection between Chatman's EEO complaint and the adverse action. Not only does Chatman fail to identify who at HQ did not make his travel arrangements before he left the NKC, he has also not produced any evidence showing that such person had knowledge of his EEO complaint. At his deposition, Chatman testified as follows—

Q:    This misunderstanding about your travel, do you believe it was in any way related to your . . . filing an EEO complaint?

A:    That's something you need to ask them [defendants]; okay? But my thing is this. The only thing I can say, it should have been made but it wasn't.

Q:    Okay. For purposes of this lawsuit, are you saying that the misunderstanding about travel arrangements was because of . . . retaliation for filing an EEO complaint?

A:    Do you want my honest opinion? I think it was intentional because I had filed a EEO complaint. Why would you assist somebody that's causing you problem. So, yes.

Q:    Beside your own belief that it was intentional, do you have any documents or other evidence to support that the misunderstanding was retaliation for filing an EEO complaint?

A:    I have proof that they didn't really – they wasn't concerned about my well-being; okay?

Q:    Okay.

A:    Because once I left—

19

> Q:    Is there any email or document that ties their lack of concern about your well-being that, as you say, to the fact that you filed an EEO complaint?
>
> A.    Sure.  I'm not sure, but I would have to re-read my email and go through that. But—
>
> Q:    Okay, I wanted to (crosstalk)—
>
> A.    I believe it was.

Id. at 101-02.

Because Chatman did not produce any evidence during discovery that identified who in HR failed to make the travel plans, he is essentially relying solely on the three months between his EEO complaint and the failure to make timely travel arrangements to prove causation. Although temporal proximity between protected activity and an adverse employment action can, in some cases, be used to survive summary judgment, it does not suffice here.  "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'…."  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270–71 (2001) (per curiam) (quoting O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (C.A.10 2001) and citing Richmond v. ONEOK, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three-month period insufficient)).  The Fourth Circuit has found that, as here, a three-month lapse between the protected activity and an alleged adverse action "is too long to establish causation, without more."  Perry v. Kappos, 489 Fed. App'x. 637, 643 (4th Cir. 2012). This further supports the finding that Count 7 fails.

Count 8 alleges that defendants retaliated against plaintiff when, as he neared the end of his deployment, they provided a negative performance rating to his stateside supervisor. Specifically, it alleges that "Mr. Holdcraft and George Guressior lied indicated [sic] that he was under-performing and lacked any contracting background to perform his duties . . . [so that]

Plaintiff would not be allowed to deploy in any future deployments." [Dkt. No. 29] at ¶82. This claim fails because, as courts in this circuit have held, a negative performance evaluation "without a collateral consequence" is not an adequate basis for a retaliation claim. Wilson v. City of Chesapeake, 290 F. Supp. 3d 444, 462 (E.D. Va. 2018) (no materially adverse action where plaintiff "failed to offer evidence suggesting he suffered some loss because of the allegedly negative comment he received in his performance evaluation"); Emami v. Bolden, 241 F. Supp. 3d 673, 684–85 (E.D. Va. 2017) ("A negative performance review, alone. . . does not constitute a materially adverse action."). Chatman has not offered any evidence that defendants gave negative feedback to his stateside supervisor shortly before his deployment ended. His allegation that this occurred is not sufficient. To the contrary, the evidence that is in the record shows that Chatman's stateside supervisor rated him "outstanding" on all three of his performance elements (i.e., provide training, advice, and assistance to the Afghanistan National Defense Security Forces on the "full range[] of cradle to grave procurement core competencies") for the appraisal period covering his deployment, from April 1, 2018 through March 31, 2019. [Dkt. No. 87] at 210-16. This outstanding performance evaluation, which would in no way hinder Chatman from being considered for future deployments, does not support a finding that defendants took a materially adverse action against him. For this reason, there is no support for a retaliation claim and Count 8 fails.

D. Hostile Work Environment

   Courts analyze an ADEA hostile work environment claim under the same standard as a Title VII hostile work environment claim. See Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003); Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998). To demonstrate a hostile work environment claim under the ADEA, an employee must prove that (1) he

experienced unwelcome conduct, (2) the conduct was based on his age, (3) the conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) the conduct is imputable to the employer. See Cosby v. S.C. Prob., Parole & Pardon Servs., 93 F.4th 707, 716 (4th Cir. 2024). An employee also must show that his age was the "but for" cause of the alleged harassment. See Gilliam v. S.C. Dep't of Juv. Just., 474 F.3d 134, 142 (4th Cir. 2007).

To determine whether conduct was sufficiently severe or pervasive to alter the employee's terms and conditions of employment, a court must evaluate the plaintiff's subjective reactions to the conduct as well as whether the reactions were objectively reasonable. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993). This evaluation requires that there is evidence that the employee subjectively considered the conduct to be sufficiently severe or pervasive to alter his conditions of employment. Breeden, 532 U.S. at 270–71 (2001). Then, the court then must consider the conduct at issue from the perspective of a reasonable person in the employee's position to determine whether it is objectively severe or pervasive. Id. at 271. The objective component enables courts "to police the baseline for hostile environment claims." Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc) (quotation omitted). In doing so, a court weighs all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Forklift Sys., Inc., 510 U.S. at 23. Mere rude or insensitive treatment cannot sustain a hostile work environment claim. See Oncale v. Sundowner Offshore Svcs., Inc., 523 U.S. 75, 80 (1998) (the ADEA does not create "a general civility code for the American workplace").

Defendants move for summary judgment on Count 10 on the basis that there is no evidence in this record that Chatman, because of his age, was the victim of harassment; but, even if there were some indicia of age-based animus, there is no evidence that it was sufficiently severe or pervasive to support his hostile work environment claim. Chatman's motion for summary judgment and his opposition to defendants' motion focus primarily on allegations—and not evidence—that defendants created a hostile work environment based on race, which is no longer at issue in this civil action. Specifically, plaintiff relies on the following conduct in support of his hostile work environment claim—

- Holdcraft moved plaintiff's desk into the hallway, which "was racial discrimination and harassment." [Dkt. No. 95] at 11. Chatman's "co-workers saw him struggling to replace his chair and desk that the white managers threw away." [Dkt. No. 91] at 22.

- Holdcraft placed a negative assessment of Chatman's work performance on the shared drive, which was "done to harass the Plaintiff to end his deployment status earlier than March 2019." [Dkt. No. 95] at 11; see [Dkt. No. 91] at 24.

- Nolen and Holdcraft harassed Chatman "based on race (African American) when . . . [they] told other white managers and co-workers 'that lazy and dumb Chatman, he reminds me of other lazy people of color' and . . . called him 'lazy and slow.'" [Dkt. No. 95] at 11; see [Dkt. No. 91] at 24.

- Chatman's "white supervisor [sic] (Holdcraft and Nolen) slandered him when they made false and damaging statements about his performance." [Dkt. No. 95] at 11.

- "Ms. [Litchelle] Brown has clearly shown how Mr. Chatman was treated by the arrogant white employers during his deployment. . . . She stated that Chatman's desk and chairs was [sic] placed in the hallway when he went on vacation by white managers." [Dkt. No. 95] at 11; see [Dkt. No. 91] at 25.

- Nolen and Holdcraft removed Chatman's post-award contracting duties. "This was an act of harassment motivated by his white managers." Id. at 23.

- Chatman's "white supervisor [sic] (Holdcraft, Warner and Nolen) committed misconduct by bullying him and harassing him when they fabricated a fake document to place him on a PIP." Id. at 27-28.

- "Plaintiff contends that his white supervisor's demeanors [sic] toward the plaintiff became extremely unprofessional and rude. Holdcraft would make several negative

comments during weekly meetings. . . . These acts were racially motivated. . . ." <u>Id.</u> at 28-29.

- "White supervisors (Nolen, Warner and Holdcraft) in the RS contracting area used racially motivated words to describe Chatman's working [sic] products." <u>Id.</u> at 29.

Chatman does not point to any record evidence showing that any of the above-listed unwelcome conduct was based on his age. His only evidence of age-related animus is having overheard Nolen and Holdcraft say that he was "too old to be on deployment" and that he was "[un]able to do the job because, based on his age." <u>Id.</u> at 79-80. These statements were made by persons who, like Chatman, were both in their 60s. In fact, Nolen was a year older than Chatman. [10] This similarity in age weakens Chatman's argument that his age was a motivating factor for any of Nolen's or Holdcraft's actions. <u>Green v. Sessions</u>, No. 1:17–cv–01365–LMB, 2018 WL 2025299, at *9 (E.D. Va. May 1, 2018).

Moreover, there is no evidence in this record that the unwelcome conduct described above was sufficiently severe or pervasive to alter a condition of Chatman's employment. "Harassment is considered sufficiently severe or pervasive to alter the terms or conditions of the employment if a workplace is 'permeated with discriminatory intimidation, ridicule, and insult.'" <u>Pueschel v. Peters</u>, 577 F.3d 558, 565 (4th Cir. 2009) (quoting <u>Forklift Sys., Inc.</u>, 510 U.S. at 21). "At bottom, a claimant must show that []he is subject to 'an abusive working environment.'" <u>Id.</u> (quoting <u>Forklift Sys., Inc.</u>, 510 U.S. at 22 (internal quotations omitted)). Chatman has not met this high bar. Negative comments about work performance or being placed on an employee performance plan alone do not create a hostile work environment. <u>See</u> <u>Webster v. Johnson</u>, 126 F. App'x 583, 587-88 (4th Cir. 2005); <u>Short v. Berryhill</u>, No. 18-2714, 2019 WL

---

[10] Nolen passed away on September 5, 2024.
https://www.dignitymemorial.com/obituaries/springfield-va/jr-nolen-11989190

4643806, at *17 (D. Md. Sept. 24, 2019) (placement on a performance plan, repeated criticism of performance, supervisor's refusal to answer her questions verbally, and a "series of aggressive emails" did not amount to a hostile work environment). And, as explained above, the removal of post-award contracting duties and the assignment of collateral duties affected all employees in the Procurement Cell, not just Chatman. Finally, moving Chatman's desk into the hallway, although seemingly petty and rude, does not render the work environment abusive. See Bridgeforth v. Potter, No. 3:10–CV–30, 2011 WL 3102422, at *13 n.12 (W.D. Va. July 25, 2011) (relocation of plaintiff's desk to a subjectively more uncomfortable location did not serve to "alter the conditions of employment and create an abusive atmosphere"). Although Chatman may have subjectively felt harassed or intimidated by the conduct about which he complains, the evidence does not support a finding that an objective person in his position would have had the same reaction. For all these reasons, Count 10 fails.

### III. CONCLUSION

For these reasons, defendants' Motion for Summary Judgment will be granted [Dkt. No. 87], plaintiff's Motion for Summary Judgment [Dkt. No. 91] and Motion for Default Judgment [Dkt. No. 92] will be denied, and judgment will be entered in defendants' favor by an Order to be issued with this Memorandum Opinion.

Entered this 22nd day of August, 2025.

Alexandria, Virginia

_____ /s/
Leonie M. Brinkema
United States District Judge

25